FILED

JUN 1 3 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOSE MOLI | § | CIVIL ACTION NO. _____ |
|     *Plaintiff,* | § | A05CA441 SS |
| | § | |
| vs. | § | Jury Demanded |
| | § | |
| UNIVERSITY OF TEXAS SYSTEM, | § | |
| UNIVERSITY OF TEXAS HEALTH | § | |
| SCIENCE CENTER AT HOUSTON- | § | |
| MEDICAL SCHOOL, DR. STANLEY | § | |
| G. SCHULTZ, DR. JOHN C. RIBBLE, | § | |
| DR. CHARLES D. ERICSSON, ANNE | § | |
| L. BRUNSON | § | |
|     *Defendants.* | § | |

### PLAINTIFF JOSE MOLI'S ORIGINAL COMPLAINT, APPLICATION FOR PRELIMINARY INJUNCTION, AND JURY DEMAND

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Jose Moli ("Moli"), hereinafter called Plaintiff, complaining of and about University of Texas System("UTS"), University of Texas Health Science Center at Houston-Medical School ("MS"), Dr. Stanley G. Schultz ("Schultz"), Dr. John C. Ribble ("Ribble"), Dr. Charles D. Ericsson ("Ericsson"), and Anne L. Brunson ("Brunson"), collectively called Defendants, and for cause of action shows unto the Court the following:

### PARTIES AND SERVICE

1. Plaintiff Moli is a citizen of the United States and the State of Texas and resides in Hidalgo County, Texas.

2. Defendant UTS is a Texas state agency and may be served through its chancellor, Mark Yudof, by mailing a copy of this complaint and a summons by certified mail to the following address: Office of the Chancellor, University of Texas System, 601 Colorado Street, Austin, TX 78701-2982.

3. The MS is an arm or branch of the University of Texas System, a Texas state agency, and may be served through its president, Dr. James T. Willerson, by personal service at the following address: Office of the President, University of Texas Health Science Center at Houston, 7000 Fannin, Houston, Texas 77030. The mailing address is Dr. James T. Willerson, Office of the President, University of Texas Health Science Center at Houston, P.O. Box 20036, Houston, Texas 77225-0036.

4. Schultz may be served with personal service at his place of business at Office of the Dean, University of Texas Health Science Center at Houston, 1133 John Freeman Boulevard, Room Number JJL410, Houston, Texas 77030-2809. The mailing address is Dr. Stanley G. Schultz, Office of the Dean, University of Texas Health Science Center, 6431 Fannin, Houston, Texas 77030-1503.

5. Ribble may be served with personal service at his place of business at the University of Texas Health Science Center at Houston, 1133 John Freeman Boulevard, Room Number JJL304F, Houston, Texas 77030-2809. The mailing address is Dr. John C. Ribble, University of Texas Health Science Center at Houston, 6431 Fannin, Houston, Texas 77030-1503.

6. Ericsson may be served with personal service at his place of business at the University of Texas Health Science Center at Houston, 6431 Fannin Street, Houston, Texas 77030. The mailing address is Dr. Charles D. Ericsson, University of Texas Health Science Center at Houston, P.O. Box 20708, Houston, Texas 77225-0708.

7. Brunson may be personally served with process herein at her place of business at the University of Texas Health Science Center at Houston, 7000 Fannin, Houston, Texas 77030. The mailing address is P.O. Box 20036, Houston, Texas 77030.

## JURISDICTION

8.  The action arises under the United States Constitution and is brought pursuant to Title 42 U.S.C.A. Section 1983, and various state causes of action.

9.  Therefore, this Court has jurisdiction pursuant to Title 28 U.S.C.A., Sections 1331, and 1343.

10. Additionally, this Court has supplemental jurisdiction over state law claims discussed below under Title 28 U.S.C.A. Section 1367(a) because they arise out of the same case or controversy.

## SUMMARY OF SPECIAL FACTS

11. Ericsson gave false testimony during his appearance in Court when defending the University of Texas Medical School against charges of discrimination brought by Moli in *Jose Moli v. University of Texas Health Science Center*; No. 88-59563; In the District Court of Harris County, Texas; Findings of Fact and Conclusions of Law signed by the Honorable Scott Brister on January 17, 1992 ("*Moli*, 1992").

12. Specifically, Ericsson falsely testified that Moli failed the course in Internal Medicine because of Moli's score position on his class ranking list. In fact, Ericsson deceived the Court and Moli with the number of students who were in the class. It was this deception by Ericsson that altered the final ranking seat of Moli thereby resulting in Moli failing, even though Moli did pass.

13. All defendants herein were aware of Ericsson's deception, and all defendants herein acted in civil conspiracy to deprive Moli of his medical education.

14. Moli discovered Ericsson's deception in October of 2003 when an anonymous employee of the Texas Attorney General's Office caused parts of Moli's old file to be delivered to Moli's counsel, who forwarded same to Moli.

15.     Upon review, Moli found pages reflecting Ericsson's testimony to Judge Brister in 1991, in which Ericsson falsely testified that Moli had been ranked among only 49 students (46 juniors and 3 remediating seniors) in the MS's Internal Medicine class.

16.     Moli then learned that, in fact, there had been 51 students and that he-Moli-had indeed passed the Internal Medicine course.

17.     Apparently as the result of Ericsson's testimony, Judge Scott Brister expressly found, *inter alia* that "Defendant Ericsson, individually, did not act arbitrarily and/or capriciously in failing Moli . . . [and] Defendant Ericsson did not fail to deal fairly and honestly with Moli." Certainly Judge Brister would not have made such findings had the true facts-about Ericsson's lie and manipulation of numbers-been known to him.

18.     Moli then spoke with the University's senior legal officer, Brunson.

19.     While speaking with Brunson, Moli also indicated that he believed Ericsson had lied.

20.     Brunson dismissed Moli's remarks.

## FACTS

21.     In January 1986, being a junior medical student, Moli began a three-month rotation in internal medicine.

22.     According to rules of the internal medicine department, each month of the three month rotation would be supervised by an "attending physician evaluator" and a "resident physician evaluator" from one of the several medical disciplines or specialties, which included: cardiology, nephrology, oncology, hematology, pulmonolgy, gastroenterology, endocrinology, general medicine services, etc.

4

23. A document produced by the MS in *Moli*, 1992, written on Ericsson's MS letterhead and signed by Ericsson, details Ericsson's ostensible procedure for assigning rotations in internal medicine. Ericsson's document reads as follows:

> "18) Ericsson first generated a grid of assignments that included three one-month rotation assignments for the number of students [enrolled in] that [particular] quarter. The grid is constructed in an attempt to guarantee that each student will have at least one rotation with a full time faculty, that rotations in the same discipline (e.g. oncology) are not repeated, that rotations away from the primary teaching hospital are minimized, that rotations with the same faculty are avoided, and that the student rotates with as many different classmates as possible. Students are allowed to request one specific rotation and/or attending physician which is honored, when possible, on a first come/first served basis. The remaining two months are determined by the grid in the interest of fair play. Students, by chance, might be assigned to the same resident for two months, and if the student requests, he or she is reassigned. Students who remediate are given preferential treatment and are not reassigned to the same faculty or resident who taught them before, and an attempt is made to be certain they do not rotate twice through the same kind of medical service (e.g. two cardiology rotations).

> "19) During the time in question a grade was generated by each resident (not intern) and faculty who taught the student each month. The student also took the medicine part of part II of the National Boards as the written final exam. The resident's grades counted 30%, the faculty 60% and the final exam [counting 10%] was added in to the final score as the actual class percentile performance. In addition, a student needed to perform better than the 5th National percentile on the exam. One could fail by an overall composite score < 54 or by posting a final exam score $\leq 5^{th}$ National percentile when the overall composite score was in the lowest 1/6 of the [class] scores [of] that quarter. These criteria were indicated in detail and the orientation booklet given to each student."

24. Drs. Robert Benjamin and D. Levin supervised Moli's first month of rotation in internal medicine in January 1986.

25. Drs. Philip Orlander and Margaret Thurmond supervised Moli's second month of rotation in February 1986.

26. Drs. George Sarosi, Bruce Baker, and Roger Schoultz supervised Moli's third month of rotation in internal medicine in March 1986.

5

27.     Ericsson telephoned Dr. Benjamin on April 25, 1986, and asked Dr. Benjamin to lower Moli's January grade from a 3.5 to a 3.0, after Benjamin's evaluation for Moli had already been recorded.

28.     Ericsson also claimed that Moli had failed the EKG examination, but Ericsson disposed of that test result without ever displaying it for review.

29.     The consequence of Ericsson's actions was to falsely label Moli as having failed the internal medicine course and thereby force Moli to retake the three-month internal medicine rotation in its entirety.

30.     Another consequence of Ericsson's actions was to jaundice Moli in the view of the Student Evaluation and Promotions Committee ("SEPC").

31.     The role of the SEPC was to review the progress of medical students considered to have academic or disciplinary problems and craft a remediation plan.

32.     Moli was forced to retake the internal medicine rotation for July, August, and September 1986.

33.     Ericsson claimed that Moli again failed the internal medicine rotation, resulting in Moli's dismissal from MS by the SEPC.

34.     On October 30, 1986, when the SEPC met to consider what it termed "Failures in Medicine," Ericsson *falsely* represented that "Moli . . . failed the medicine clerkship. He had previously failed the course and had been required to repeat it in its entirety."

35.     In September, Moli had been assigned to an "M.D. Anderson" rotation with Dr. Lopez-Berenstein as "the attending physician" and Dr. Perkins as the resident. Moli reported to Drs. Ericsson, McNeese, and members of the SEPC that he thought Dr. Perkins was treating him unfairly. As a consequence, Moli received a poor evaluation from Dr. Perkins and Dr. Lopez-Berenstein.

6

36. Nevertheless, because of instructions from Dr. Sarosi (who was Vice Chair of the Department of Internal Medicine), Ericsson relieved Moli of his September clinical duties. Moli made a score in Internal Medicine in the 10th percentile. Dr. Ericsson testified that "he had eliminated Dr. Perkins' evaluation in determining Mr. Moli's final grade. He said that had he also eliminated Dr. Lopez-Berenstein's evaluation, Mr. Moli would have passed the course, but [had arbitrarily declined to eliminate Dr. Lopez-Berenstein's evaluation because] . . . he did not think that that would be fair . . . ." The ostensible result of Ericsson's manipulation was to give the appearance that he had acted to help Moli fail less profoundly.

37. Furthermore, the MS, through the SEPC also incorrectly indicated that Moli failed the basic science courses of Biochemistry and Pharmacology when he, in fact, did not.

38. As the result of being labeled as "having failed" internal medicine, Moli was dismissed from medical school.

39. It was discovered that on February 2, 1987, Kathleen Andreoli, Vice President of the University of Texas Health Science Center at Houston, wrote to Dr. Roger Bulger, President of the University of Texas Health Science Center at Houston, requesting Moli's reinstatement in medical school, because of her investigation into the charges by Moli of racial discrimination.

40. On March 24, 1987, Vice President Andreoli reported receiving a telephone call from Dr. Lauro Guerra attempting to obtain the MS' consent for Moli to transfer to Texas Tech University medical school.

41. Vice President Andreoli noted in her own hand that, while Moli could not validate discrimination, she could, stating, **"I can validate discrimination, he can't. We have a problem. If he fails he can use discrimination."** (emphasis added.)

42. On November 17, 1988, Moli filed suit against the University of Texas Health Science Center at Houston, the University of Texas, and Ericsson in *Moli*, 1992.

43. In his lawsuit, Moli claimed that he had been discriminated against by the University of Texas Health Science Center (at Houston) medical school.

44. While Moli's case was awaiting a bench trial before Judge Brister, Moli's undersigned counsel suffered a heart attack (specifically, a myocardial infarction) on approximately April 17, 1991, during trial in Hidalgo County, Texas.

45. Judge Brister called Moli's counsel to trial on April 30,1991, while Moli's counsel was recovering from post infarct pneumonia and awaiting hospital admission for bypass surgery. At the conclusion of the first day of trial, because of the rapidly deteriorating health of Moli's counsel, Judge Brister recessed the Moli case, but declined to grant a mistrial.

46. After Moli's counsel recovered from surgery, Judge Brister continued the case, and the remaining evidence was eventually heard on October 28, 1991, with the Final Judgment being signed on November 12, 1991.

47. Prior to trial on April 30, 1991, defendants in the *Moli*, 1992 case–subject to a confidentiality agreement–produced various documents. At that time, the court and Moli were not aware that the defendants–in violation of the rules–*concealed* at least a part of one of the documents, and other entire documents.

48. The withheld information was salient, and was later inadvertently delivered to Moli through his counsel in October 2003. This information revealed that Ericcson had withheld pivotal information during the 1991 trial. This withheld information further demonstrated that Moli should have passed the Internal Medicine class.

49. During the October 1991 resumption of the bench trial, Ericsson had been called as a witness to explain how he calculated Moli's failing grade in internal medicine.

50. In his testimony, Ericsson stated inter alia, the following:

   a. he had *recalculated* Moli's composite score, *modifying and even deleting the evaluation of the September resident* (Perkins), with the result that Moli still failed;

   b. he had also recalculated Moli's composite score, deleting both Lopez' and Perkins' evaluations, with the same result that Moli still failed;

   c. he stated that Moli would have had a composite score of 66 if Ericsson had deleted Perkins' evaluation as Ericsson had said was done;

   d. he said that nevertheless, Moli still failed because he–Ericsson–was bound by the mathematical result of dividing the total number of students ("**49**") (of the class ranking list), by the number "**6**" (because of the rule that the lower 1/6 failed and the upper 5/6 passed), which placed Moli in the lower 1/6 of the class;

   e. he stated that there were 46 junior medical students, and three remediating senior medical students for a total of **49** students to be the numerator.

51. Indeed, *the list of students provided by defendants* was a two page list reflecting only 49 named students.

52. Moli learned in October of 2003 that *Defendants had withheld a third page, which reflected that the correct total number of students in the numerator should have been 51.*

53. The concealed information was disclosed when Moli requested in 2003 that the Texas Attorney General's Office provide him with copies of any records it might have retained on his case. *It was during his review of those documents eventually produced over a decade after Moli, 1992, Moli discovered there was indeed a third page of named students, which would have changed the*

9

*formula used to determine passing students, and which would have resulted in Moli passing the internal medicine class and not being dismissed from the medical school.*

54. As a check, Moli communicated with Brunson and asked that she produce documents from his case, including the "Class Ranking 1st Quarter 1986, June to September 1986."

55. When Brunson complied with Moli's request in February/March 2004, she produced only two pages of names for a total number of **49**, with the names redacted.

56. Additionally, other documents produced by Brunson to Moli *reflected crude alterations of information*.

57. When Moli inserted **51** into Ericsson's grading fraction as the numerator instead of **49**, it became apparent that he had not failed but had instead passed the course, and that two fellow students (Eugene P. Heslin, and Chala Sargent) who had lower scores than Moli on their National Board Examinations were passed by Ericsson, graduated by MS, and have been practicing medicine for nearly two decades–while Moli has been relegated to the ranks of failed medical students.

## FRAUD & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

58. Defendant Ericsson intentionally falsified testimony to induce the University of Texas to fail Moli, and to induce State District Judge Brister to rule in favor of the University of Texas Medical School (the "MS" herein).

59. Defendants retaliated against Moli because he filed complaints against and/or challenged the University of Texas Medical School/MS for allowing this falsification of Moli's records and the wrongful dismissal of Moli from the medical school that inevitably followed.

60. Defendants' conduct was extreme and outrageous and proximately caused Plaintiff Moli severe emotional distress. Plaintiff suffered damages for which Plaintiff Moli herein sues.

## DAMAGES

61. Plaintiff sustained the following damages as a result of the actions and/or omissions of Defendants described herein above:

    a. economic damages, and damages for severe emotional anguish;

    b. all reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff;

    c. all reasonable and necessary costs incurred in pursuit of this suit; and

    d. punitive damages against the individual defendants.

62. Plaintiff seeks the following specific relief which arises out of the actions and/or omissions of Defendant described herein above:

    a. Prohibit by injunction the Defendants from engaging in the publication and retention of records that falsely indicate that Moli failed the internal medicine class and basic science courses of biochemistry and pharmacology and was subsequently dismissed from medical school; and

    b. correct and rectify, by injunction, Moli's academic records at the MS and re-admit Moli at the senior level he attained in the MS prior to the falsification of his records;

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Jose Moli, respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of the Court; together with interest as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

11

Respectfully submitted,

WATTS & ASSOCIATES, P.C.

By: *Lwatts*
Larry Watts
T.B.N. 20981000
Attorney-in-Charge
P.O. Box 2214
Missouri City, Texas
Telephone:   (281) 431-1500
Facsimile:    (281) 431-1298

ATTORNEY FOR PLAINTIFF JOSE MOLI

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**